**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**

**PAUL KAY CORONEL**                                                          **PLAINTIFF**

**V.**                                                    **CIVIL ACTION NO.2:05CV-120-WAP-JAD**

**SYLVESTER WALKER, et al**                                               **DEFENDANTS**

**REPORT AND RECOMMENDATION ON**
**MOTIONS FOR SUMMARY JUDGMENT**

        The undersigned has reviewed the record in this matter.  Coronel has filed suit alleging that

the defendants have violated his First Amendment and RLUIPA rights.  Presently pending in this

action is the plaintiff's motion for summary judgment (Doc. 16).  The defendants' response is their

own motion for summary judgment (Doc. 31).  Coronel responded to this motion for summary

judgment and the defendants filed their reply.  Because Coronel raised a claim for violation of the

Establishment Clause of the First Amendment in his response to the defendant's motion for summary

judgment, the defendants sought and were granted an extension of time in which to file a

supplemental motion for summary judgment (Doc. 69).  Coronel responded to the supplemental

motion for summary judgment and filed a motion to strike it.

**SUMMARY JUDGMENT STANDARDS**

        Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed.R.Civ.P.

56(c).  Rule 56(e) Fed.R.Civ.P. requires that materials supporting or opposing the motion be

admissible at trial. Material that would be inadmissible cannot be considered on a motion for summary judgment since it would not establish a genuine issue of material fact.

Summary judgment is proper "where a party fails to establish the existence of an element essential to his case and on which he bears the burden of proof. A complete failure of proof on an essential element renders all other facts immaterial because there is no longer a genuine issue of material fact." *Washington v. Armstrong World Indus.*, 839 F.2d 1121, 1122 (5th Cir.1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265(1986) If the party with the burden of proof cannot produce any summary judgment evidence on an essential element of his claim, summary judgment is required. *Geiserman v. MacDonald,* 893 F.2d 787, 793(5th Cir. 1990).

The moving party must make an initial showing that there is no dispute of material fact or that there is a failure of proof of an element of the claim. If this showing is made, the non-movant must go beyond pleadings and submit specific evidence showing that there are one or more genuine issues of fact to be resolved by trial. In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(emphasis omitted). While all facts are considered in favor of the non-moving party, including all reasonable inferences therefrom, *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995), the nonmovant's burden, " is not satisfied with 'some metaphysical doubt as to the material facts,' *Matsushita,* 475 U.S. at 586, 106 S. Ct. at 1356, by 'conclusory allegations,' *Lujan,* 497 U.S. at 871-73, 110 S.Ct. at 3180, by "unsubstantiated assertions," *Hopper v. Frank,* 16 F.3d 92 (5th Cir.1994), or by only a "scintilla" of evidence, *Davis*

*v. Chevron U.S.A., Inc.,* 14 F.3d 1082 (5th Cir.1994)." *Little v. Liquid Air Corp.* at 1075.[1] Summary judgment is appropriate if "critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Armstrong v. City of Dallas,* 997 F.2d 62 (5th Cir.1993). If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted.

These standards have been applied in evaluating the evidence of record in support of and opposition to the motion for summary judgment.

## <u>SUMMARY OF EVIDENCE</u>

Paul Coronel is an inmate at Tallahatchie County Correctional Facility(TCCF) in Tutwiler, Mississippi. The facility is owned by the Tallahatchie County Correctional Authority. The Tallahatchie County Correctional Authority is a political subdivision of the State of Mississippi, but not a party to this action. Corrections Corporation of America(CCA) is a private company contracted by this authority to run this facility. Coronel is an inmate from Hawaii, housed at TCCF pursuant to a contract between the State of Hawaii and the Authority. CCA is the subcontractor on the contract with Hawaii.[2] The other parties to this action are Joseph Watson, the chaplain at TCCF and Sylvester Walker, who ran the program at TCCF's Faith Based residential pod.

Coronel, a Dianic Wiccan, entered the TCCF faith based pod, knowing the program incorporated Christian principles and teachings. He found Christian teachings within the program condemning witchcraft and paganism to be offensive and demanded that the defendants change the

---

[1] Quoting from *Matsushita Electric Indus.Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed. 2d 538(1986) and *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111L.Ed.2d 695(1990).

[2] See Exhibit 5 , p 24 to the complaint.

program to accommodate him and the three other Wiccans who entered the pod. When they failed to respond to his satisfaction, he sued alleging violation of his First Amendment right to free exercise of his faith. He brought this action pursuant to 42 U.S.C. § 1983 alleging "abuse of federal funding"and violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA) 42 U.S.C. § 2000cc-20000c-5. He claimed for the first time in response to the defendants' motion for summary judgment that his pleadings include claims for violation of the Equal Protection, Due process, and the Establishment Clause to the Constitution. Coronel seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

The faith based living pod at TCCF is called the Life Principles Community Program. It utilizes Christian teachings and principles as part of its program. It is the only faith based residential program at TCCF, but is housed in a pod that is physically identical to all the other pods. CCA says that the program is a behavior modification and life skills training program. Its rehabilitative goals include teaching inmates life skills; to accept responsibility and to act responsibly; and to deal constructively with authority. The program materials placed in the record by Coronel show both religious elements and rehabilitative elements in the program's literature. CCA offers a multitude of other programs, including a secular version of the life skills training program, though it is not residential. There are no special privileges accorded to inmates for participation, nor penalty for not participating. CCA claims the program is entirely voluntary and that there is no penalty for dropping out of the program.

CCA began recruiting inmates for the Faith Based Unit in April 2005. Each inmate, including Coronel signed a contract, as a condition of participation, that provides in pertinent part as follows:

- This is a voluntary program; therefore, I understand and agree to the following:

- My decision to participate in the LPCP is of my own free will.

- My decision to participate in the LPCP will not affect my parole.

- I will be housed in the LPCP pod.

- I will abide by all Institutional Rules and Regulations and additional housing pod rules of the program....

- I volunteer to participate with the full function of the program....

- The LPCP contains religious content and is based upon Christian values and principles.

- I do not have to be of the Christian faith to participate in the LPCP.

- I understand that I may discontinue participation in the LPCP at any time.  I also understand that violation of any rule or regulation of the facility/housing program pod or any behavioral problem may result in my removal from the LPCP.

- I will not be penalized in any manner if I withdraw from the LPCP.

The contract was signed by Watson as well as Coronel.

Coronel claims that he joined the program in part because he had participated in another faith based unit at another CCA prison.[3]  Coronel does not dispute the defendants' characterization of the

---

[3] Coronel, though singing the praises of the Arizona CCA program in this suit, sued the Arizona program in *Coronel v. Paul*, 2:01cv2222, Arizona (316 F. Supp. 868(Ariz. 2004)).  In that litigation Coronel claimed CCA infringed his Free Exercise rights and RLUIPA rights when he was not allowed to worship with the Pasqua Yaqui Native Americans.  Though the published opinion denied the initial motion for summary judgment because of credibility issues regarding

program, except that he describes a very church like environment, complete with opening and closing prayers, Bible study, Bible verse memorization and the singing of Christian songs. He also claims that the nature of the program was misrepresented to him.[4] Coronel claims that on entering the pod he and others were forbidden from studying any texts other than program texts and the King James Bible.[5] Some of his statements make it appear that there was a total ban on his practicing his faith in any manner within the pod. In other statements his complaint is that he was not allowed to

_____

Coronel's motivation in wishing to attend the services, it ordered the parties to address the issues of "compelling state interest" and "least restrictive means." The Arizona court's docket indicates this subsequent motion for summary judgment was granted. The case is now on appeal to the Ninth Circuit Court of Appeals.

In *Coronel v. State of Hawaii,* 76 F.3. 385(9th Cir. 1996) Coronel alleged that his First Amendment and RFRA rights were violated by the state. The district court denied him relief and the Ninth Circuit Court of Appeals affirmed.

In *Coronel v. Hawaii*, 9 F.3d 1556(9th Cir. 1993), Coronel had alleged violation of his First Amendment Rights because he was not allowed to attend Mormon Services, though he did not claim to be a Mormon. He was classified as in 'close custody' and therefore prohibited from leaving his unit at night. The Mormon services were at night. He was unsuccessful in this litigation.

This is a synopsis of litigation involving a claim of violation of his religious rights, but is not a complete list of his *pro se* litigation.

[4] He claims defendant Chaplain Watson assured him 1) that the unit would be non-denominational; 2) would respect all minority religions, including Wicca; and 3) that non-Christians would not be forced to study the Christian Bible; or 4) be forced to participate in religious conduct contrary to their personal beliefs. He claims the defendant Walker also told him the program would be non-denominational and that persons of all faiths were welcome. He admits that he signed the contract acknowledging that Christian verses would be studied. Coronel claims to have believed "his religion and its tenants(sic) and literature too would be permitted and studied," though he offers no facts to demonstrate the objective reasonableness of this belief.

[5] "Anyone found studying or worshiping any literature from any other religion would be kicked out of the program, subjected to disciplinary action, and removed from the Unit within one hour .... Mr. Walker informed all students that any inmate found worshiping or studying these religions would be subject to disciplinary action and kicked out of the Unit." Complaint p 9.

practice his Wiccan faith during program hours. Chaplain Walker, according to Coronel preached or lectured that witchcraft was evil and that any practitioners should repent. Program literature supports his claim that witchcraft was condemned in the program. Because he is of the opinion that he has a constitutional right both to be in this faith based unit, and to freely practice his faith as he wishes within this unit, though greatly offended at the teaching of Christian theology telling him that he is literally going to hell and though he claims to be emotionally traumatized by these teachings; and despite his claim the defendants misrepresented the program, he refused to leave the unit.[6] He demands various changes through his meetings with Watson, his grievance and this lawsuit. The demands range from terminating the program, through allowing multiple programs to run simultaneously within the pod, to an outright prohibition on any Christian prayers of the singing of Christian songs.[7]

Coronel reports that a number of threats, including not only removal from the unit, but of disciplinary action were made by Walker. He claims there were threats of removal and disciplinary action for being caught studying Wiccan literature or engaging in Wiccan worship within the pod. Sometimes Coronel makes it clear that the threats were directed at activities within program hours

---

[6] Coronel on the day the program began, wrote to the Shari Kimoto, of the Hawaii Department of Public Safety complaining that non-Christian members were being required to study the Bible and memorize Bible verses. He complained that the program made "no provision for my religious literature or teachings." He reports that he was told if he objected he would not be welcome and could either leave the program or be terminated against his will. He declared, "I have no intention of leaving the program. To be forced out of the program, or be forced to study Christian doctrine would violate my First Amendment rights." He suggested that the program be changed to drop any requirement for studying Christian materials and that the "TCCF restructure the program along the practice done in Arizona ...."

[7] None of the parties have provided a description of the physical facilities, but this complaint by Coronel suggests that the pod too small to allow for more than one group to meet at a time, without hearing at least some parts of the other group's activities.

and other times he fails to be specific. Walker allegedly says at one point that anyone attending non-Christian services outside of the pod is in violation of the program and subject to punishment. Coronel claims that Walker was very hostile in his demeanor and action toward him and other non-Christians. Walker supposedly said he wanted non-Christians out of the program. Coronel characterizes himself as a thorn in Walker's side.

Coronel never suggests in his complaint, several personal affidavits, his brief, or in the affidavits of other inmates that there were any threats that leaving the program would result in disciplinary action or other adverse consequence. He never suggests that he did not leave the program for fear that he would be punished if he quit. Coronel, without dispute, remains in the unit and participates because he intends to compel change, not because he is cowed by any threats. Coronel does not allege that either he or any other inmate was subjected to any disciplinary action for believing differently than Walker; for any religious activity within the pod; or for any other thing that occurred in connection with this program.

Additionally, the defendants assert, and Coronel does not dispute, that while living in this faith based unit he continued to attend Wiccan worship services on a regular basis. CCA scheduled the LPCP programs to avoid conflicts with religious services offered outside the pod. The Wiccans have twice weekly programs. They are also provided an opportunity to celebrate religious feasts, for which CCA provides special meals. Additionally CCA provides refreshments for 'hospitality' for the Wiccans. Watson, as a part of his employment with CCA, coordinates these services for the Wiccans.

Watson also deals with providing for the religious needs of nine to ten different faith groups. There are fifty plus services per week at the Tallahatchie Correctional Facility with an average

attendance of about 600 per week. Coronel and three other Wiccans were at some time in this LPCP, and by his estimation about 25% of the participants were non-Christians.

Coronel filed grievances with CCA regarding the alleged violation of his rights and was told these matters were non-grievable because he had signed a contract to enter the program and agreed at that time to abide by the rules of the program. He filed suit on June 24, 2005. In September 2005, due to a disciplinary violation that occurred outside the pod, Coronel was involuntarily removed from the LPCP program. He was accused of improperly being in possession of inmate Edward Dean's legal papers.[8] He filed a "Notice of Retaliation" with this court and requested a preliminary injunction to force the defendants to place him back in the program. The plaintiff was instructed by court order on how to properly move to amend his complaint to add the claim for retaliation, and to submit a proposed amended complaint. Having failed to do so, the retaliation claim has been abandoned.

## FREE EXPRESSION AND RLUIPA CLAIMS

Coronel claims that the faith based pod as operated by CCA at the Tallahatchie County Correctional Facility violates his First Amendment Free Expression rights and statutory rights under RLUIPA, the Religious Land Use and Institutionalized Persons Act.[9] He claims his rights have been infringed because he has been 'forced' to participate in Christian prayers, study and other activities and because he was not able to freely study and practice his own faith within this unit.

---

[8] Dean filed suit in this court, coincidentally, against CCA for First Amendment and RLUIPA violations. See Civil Action No. 2:05cv31.

[9] Coronel erroneously cites to and argues 41 U.S.C. § 2000cc. This portion of the RLUIPA deals with land use regulations. The following section 2000cc-1 is the appropriate section.

The First Amendment claim is governed by standards that are much more deferential to prison authorities than RLUIPA. In order to establish either claim, Coronel must prove that a substantial burden has been placed on his religious practice. In order to defend a First Amendment claim, the prison authorities need only prove the policies and procedures are rationally related to legitimate penological goals under *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L.Ed.2d 64(1987)(Where a prison regulation burdens a fundamental constitutional right, it must be reasonably related to legitimate penological objectives and may not be an exaggerated response to those concerns) and *O'Lone v. Shabazz.*, 482 U.S. 342, 107 S. Ct. 2400, 96 L.Ed2d 282(1987)(Work regulations that required inmates to work outside of the main building and prohibited their return, for security reasons during the day, prevented Muslim inmates from attending their weekly religious services. The regulation was constitutionally valid.) A challenged regulation or program might well pass constitutional muster under traditional First Amendment analysis, but run afoul of RLUIPA or its sister act, the Religious Freedom Restoration Act 42 U.S.C.A § 2000bb (RFRA). A policy or program cannot clear the stringent standards of RLUIPA and still run afoul of *Turner v. Safley* and *O'Lone v Shabazz*. In this case if the defendants are entitled to summary judgment on the RLUIPA claim, they are necessarily entitled to summary judgment on the First Amendment Free Exercise claim.

IS CCA SUBJECT TO RLUIPA?

Does RLUIPA apply to Correctional Corporation of America either generally or with regard to this specific program? The corporate defendant has submitted an affidavit that it receives no federal assistance and that the funding for the program in its faith based pod is the private profits of Corrections Corporation of America.. Coronel responds with unsupported allegations that CCA does

indeed receive federal funding, and that an examination of its books at trial will demonstrate the correctness of his assertion.

What facts would make the RLUIPA applicable and who has the burden of demonstrating that the act either is or is not applicable? RLUIPA does not say who bears the burden of proving the applicability of the act. RLUIPA explicitly assigns the burden of persuasion to the 'government' on all elements of the claim, except that the plaintiff must show that the 'government' has imposed a substantial burden on the plaintiff's religious exercise. 42 U.S.C. § 2000cc-2(b). For the purposes of RLUIPA, CCA appears to be a 'government' as defined by that statute. It is acting 'under color of State law." 42 U.S.C. § 2000cc-5(4) and *Wong v. Stripling*, 881 F. 2d 200,202 (5th Cir. 1989). RLUIPA additionally defines "program or activity" to mean "all operations of any entity as described in paragraph (1) or (2) of section 2000d-4. A 'program or activity' is defined by § 2000d-4a to mean "all operations of "a department, agency, ..., or other instrumentality of a State ...." *Id.* Given the contractual arrangements set forth in the record, for the purposes of these summary judgment motions, CCA is not only acting under color of law in running this prison but must be considered as acting as a surrogate or instrumentality of the State of Hawaii.

RLUIPA further provides that it is to be construed "in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3. The statute is specifically designed to protect the religious freedoms of prisoners and other institutionalized persons. These individuals can be expected to most frequently be proceeding *pro se* and generally with considerably less skill and experience that Coronel. It is unrealistic to think these plaintiffs will have the skill to conduct the needed discovery or the sophistication to understand the vagaries of accounting or the maze of government bureaucracy.

Considering both the instruction to broadly construe the statute in favor of claimants and that the statute expressly assigns only one burden of persuasion to them (proof of a 'substantial burden' on their religious exercise), the undersigned is of the opinion, that a claim that RLUIPA is not applicable, because there are no federal funds involved in a program, should be treated as an affirmative defense. CCA should bear the burden of proving facts to establish any exemption from its terms.[10]

Has CCA established that RLUIPA does not apply to TCCF? Given the broad definition of programs and activities in this statute it appears that the receipt by Hawaii of federal funds for use in its corrections programs would be sufficient to bring CCA within the broad ambit of RLUIPA.[11] CCA's affidavit establishes that it does not directly receive funds from the federal government, and that all of its funds are received pursuant to contracts for corrections services rendered or to be rendered. This alone does not establish that CCA is beyond the broad reach of RLUIPA as a matter of law. Therefore, for the purposes of evaluating Coronel's RLUIPA claim on summary judgment it is assumed that RLUIPA is applicable to this institution and this program.

HAS CORONEL ESTABLISHED A PRIMA FACIE CASE?

RLUIPA provides in pertinent part,

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person--(1) is in furtherance

---

[10] Placing this burden on CCA , is also consistent with 42 U.S.C. 2000cc-2. That section explicitly places the burden on the government, if impact on commerce is the sole jurisdictional basis, of demonstrating that the 'burdens' or 'removal of burdens' on a nationwide basis would not have a substantial impact on commerce, in order to defeat jurisdiction.

[11] Judge Mills reached the same conclusion in Dean v. CCA, 2:05cv31, in a recent memorandum opinion (Doc. 92).

of a compelling government interest; and (2) is the least restrictive means of further that compelling governmental interest.  42 U.S.C.§ 2000cc-1(a).

The first question to be answered is "What constitutes a substantial burden?"  The Fifth Circuit set out the definition of a substantial burden in *Adkins v. Kaspar,* 393 F 3d 599, 569 (5th Cir. 2004).  Adkins had challenged the Texas Corrections policy that resulted in the Yahweh Evangelical Assembly not being able to gather weekly on their Sabbath for worship, as required by their faith.  The policy required the presence of a minister or approved volunteer.  Because no minister or volunteer was available on a weekly basis, the Sabbath worship services were less frequent.  The Fifth Circuit held:

> [A] government action or regulation creates a 'substantial burden' on the religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs.  And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulations is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.  On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed. *Id.* at 569-570.

Coronel states over and over again that he was 'coerced' and 'forced' and 'compelled' to listen to and study Christian teachings.  He goes on at great length about how offended, distressed and demeaning he found this exposure.  But these are conclusory allegations, not facts.  What do the facts show.  Coronel's theory is that he had a constitutional right to be in the faith based pod and a constitutional right to worship and study his faith as he pleased within the program.  He places great emphasis on all that he 'had' to do was sign the contract in order to get into and stay in this offensive program.  He even made a brief, now abandoned, attempt to force the defendants to place him back in the program.  He talks about what he was forced to do within the program, assiduously ignoring

13

that, on the record he has made, he was at all times free to decline the program in the first instance or to leave it at the first mention of anything that offended his sensibilities or faith. Coronel's RLUIPA and Free Exercise claim both fail for the most basic of reasons--no one has forced Coronel to either forgo the private and corporate worship of his Wiccan faith, nor forced him to participate in the study of any part or portion of the Christian faith.[12]

Coronel is of the opinion that the only type of faith based unit that is constitutionally permissible is one with multiple faiths within the unit. Even if Coronel were correct in this assumption, and the faith based unit as it exists at TCCF is constitutionally barred, that, without more, does not convert his participation in the program into anything but a voluntary act. Coronel demands the right both to enter the program and then to ignore its rules and do as he pleases within the program. He claims he has no freedom and was coerced, because this option has not been made available to him. His attempts to characterize his participation as coerced does not change the undisputed facts. He chose to enter and stay in the program so that he could complain about the content. The only compulsion in the record was his involuntary removal from the unit after he was found guilty of a rules violation outside of this unit. With his having had the choice at all times to leave the unit, he has experienced no interference with his free exercise rights, much less a substantial burden on his faith. Whatever level of coercion or pressure was brought to bear within the unit, to conform and participate and enforce its own rules, so long as Coronel was free to leave the program, without penalty, CCA has afforded him all the freedom to which he was entitled.

---

[12]

     The case of *Faulkner v. Johnson County Sheriff's Department*, 2001 WL 322430(N.D. Tex 2001) provides an example of true coercion. Prisoners while locked in their cells were subjected to 'hell fire and damnation' sermons from a volunteer minister. Since they could neither leave their cells, nor block the minister's voice from their cells, this amounted to involuntary inculcation.

Nor can it be said that he has, on the basis of his faith, been denied any 'substantial benefit' that was otherwise generally available. There is no dispute that a secular life skills program was available. This pod was physically identical to other pods. Coronel clearly has no constitutional right to claim any specific housing. In *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451(1976) the United States Supreme Court held that an inmate had no due process right to challenge a transfer to an institution with substantially less favorable conditions. In Coronel's case the physical facilities are identical. The 'generally available benefit' a behavior modification/life skills program was available to Coronel in religious or secular form. There was no generally available benefit in choosing his housing.

Coronel has complained that he was not allowed to practice witchcraft during program hours in a Christian based life skills program. Instead CCA provided an alternate time and place for Wiccan worship. That there were restrictions as to time and place for the Wiccans to practice their faith does not constitute a substantial burden. In *Diaz v. Collins*, 14 F.3d 69 (5th Cir. 1997) the Fifth Circuit noted with approval the cases of *Johnson v. Baker,* 67 F.3d 299 (6th Cir. 1995) (unpublished)and *Abdur-Hahman v. Michigan Dept. of Corrections*, 65 F.3d 49, 492 (6th Cir. 1995). In *Johnson* the Sixth Circuit held that a member of the Nation of Islam Muslims was not substantially burdened in his religious practices by regulations that deprived him of a particular time and place to practice his beliefs and deprived him of the company of other black Muslims. In *Abdur-Hahman* the court held that reasonable time, place or manner restrictions upon communal religious gatherings do not necessitate the identification of a compelling state interest. The restrictions in the record regarding program time are precisely the type of time and place restrictions upheld in these cases. This type of

time and place restrictions are necessary to prevent disruption, burden and infringement on the rights of other inmates.

Additionally, the threats and hostility attributed to Walker do not create a triable issue regarding substantial burden. As noted earlier, Coronel has not claimed there were any threats directed at forcing inmates to remain in the program. The "out" door was open to Coronel. The remaining threats from Walker, so far as the record shows, were never carried out. The Fifth Circuit Court of Appeals has held that mere words, no matter how antagonistic, are not actionable. *McFadden v. State*, 713 F. 2d 143, 146 (5th Cir. 1983). Walker's threats were of disciplinary action. *McFadden* involved threats of physical violence. If threats of violence, which a corrections officer would presumably be able to carry out alone are not actionable, threats of disciplinary action, which Walker could not presumably carry out alone, most certainly cannot be actionable.

Because Coronel has not produced evidence to make out a triable issue on any 'substantial burden,' there is no need for discussion or proof regarding any compelling state interest, nor whether the least restrictive means have been employed. Coronel's RLUIPA claim and § 1983 claim for violation of his First Amendment rights to free exercise fail. The defendants are entitled to judgment as a matter of law. Coronel's claims that he was forced to participate in these activities with their religious content are frivolous.

## CONTRACT CLAIM

Coronel claims that he has a right to a faith based unit under CCA's contract with the state of Hawaii. The contract requires the provision of multiple programs including drug and alcohol treatment and a "faith based unit." The contract is silent regarding any terms or conditions regarding the unit. Even assuming that Coronel qualified as a third party beneficiary to the contract, the contract

does nothing to support his claims that the unit had to conform to his allegations, or the running of another faith based unit in which he previously participated. This claim is frivolous.

## ESTABLISHMENT CLAUSE CLAIMS

In his reply to the defendants' motion for summary judgment, Coronel for the first time raises a claim that the residential faith based pod, because its program is based upon Christian principles, violates the Establishment Clause. The defendants, with leave of court, filed a supplemental motion for summary judgment asserting that the Establishment Clause was inapplicable, or alternatively, not violated by the LPCP program.

1. <u>Applicability of the Establishment Clause to Corrections Corporation of America</u>

The defendants contend first that the Establishment Clause does not apply to them, a private company, running this prison under a contract. While the definition of what constitutes a 'government' for Establishment Clause purposes is not nearly as broad as the RLUIPA definition, CCA clearly is acting under color of state law. In keeping with Supreme Court jurisprudence on the subject, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152, 90 S. Ct. 1598, 26 L. Ed. 2d 142(1970) ("To act 'under color' of law does not require that the accused be an officer of the state.") and its own earlier ruling, *Wong v. Stripling,* 881 F. 2d. 200, 202(5th Cir. 1989)("A private entity may be deemed a state actor, when that entity performs a function which is traditionally the exclusive province of the state."), the Fifth Circuit Court of Appeals has expressly found that private run prisons are state actors and subject to the constitutional restrictions placed on the government. "[P]rivate prison-management corporations and their employees may be sued under § 1983 by a prisoner who has suffered a constitutional injury. Clearly, confinement of wrongdoers-though sometimes delegated to private

17

entities-is a fundamentally governmental function. These corporations and their employees are therefore subject to limitations imposed by the Eighth Amendment." *Rosborough v. Management & Training Corp.*, 350 F. 3d 459, 460 (5th Cir. 2003). Nothing in *Rosborough's* reasoning would limit CCA's status as a state actor depending upon the particular constitutional right implicated. It seems clear that just as the state may not constitutionally 'establish' a religion directly in its prisons, it may not do so indirectly by the use of privately contracted prisons.[13] The defendants cite no authority to the contrary. In running TCCF, CCA must conduct itself within the confines of the Establishment Clause.

2. Establishment Clause Tests

Alternatively, the defendants argue their program does not violate the Establishment Clause. There are three different tests used by the United States Supreme Court in evaluating Establishment Clause claims. They note accurately that the three prong test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745(1971) has been harshly criticized by the United States Supreme Court. Multiple Justices have expressed their opinion that it is no longer good law. Because it has not been expressly overruled by the Court, the defendants seek to convince this court that their program is valid under *Lemon's* more demanding standards, as well as under the 'coercion' and 'endorsement' tests.

---

[13] It may be that CCA, since it surely does have some profits that are truly its own funds, may have some small additional leeway over and above that available to federal, state and local governments, in accommodating inmate's religious needs. The reach of the Establishment Clause to CCA may not be coextensive to its reach to purely governmental entities. Determining whether and to what extent CCA may use its profits as a 'volunteer' in any type of religious activity is not necessary to this report and recommendation.

What are the various standards that have been used in evaluating Establishment Clause laws? The most widely known and roundly criticized is the three prong test in *Lemon v. Kurtzman*. *Lemon* involved challenges to Rhode Island and Pennsylvania statutes which provided financial support to parochial schools. Under *Lemon* a statute or government program must; 1) have a secular purpose, 2) its primary effect may neither advance or inhibit religion, and 3) it must not excessively entangle government with religion. The Rhode Island statute provided a salary supplement teachers in nonpublic schools on certain conditions including the requirement that the teachers agree to teach no religion courses. The trial court found that the sole beneficiaries of the statute were teachers in Roman Catholic schools. The Pennsylvania statute reimbursed nonpublic schools for teacher salaries, textbooks and instructional materials for specific secular subjects. The primary beneficiaries of the Pennsylvania statute were Roman Catholic schools. Each statute imposed restrictions to separate secular from religious education to avoid subsidy to religious education. Each would involve some level of state surveillance of education in the parochial schools. Each was found unconstitutional because they created excessive entanglement of the state with religious institutions.

The Court has also used an "endorsement" test. In *County of Allegheny v ACLU*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed. 2d 472(1989), the Court considered two challenges to two holiday displays. One display was of a creche, surrounded by poinsettias, set apart from other holiday displays. It was placed in the Grand Entrance to the courthouse, the most attractive and prominent place in the courthouse. Because "[n]o viewer could reasonably believe that it occupies this location without the support and approval of the government," *Id.* at 599, 600. 109 S.Ct. at 3104(1989), the display was an improper endorsement of a particular faith and a violation of the Establishment Clause. A mixed display of a Christmas tree, a menorah and a salute to liberty, at other government property,

in part because these holidays have acquired a secular meaning in our society, did not violate the Establishment Clause because it  was not an impermissible endorsement of either Christianity or Judaism.

At still other times, the Court has conducted its evaluation under a "coercion" analysis.  An example of this is found in *Lee v. Weisman*, 505 U.S. 577,  112 S.Ct. 577, 120 L.Ed.2d(1992).  In *Weisman* a middle school graduation ceremony that included an invocation and benediction from a minister or rabbi invited by the school, violated the Establishment Clause.

> "At a high school graduation, teachers and principals must and do retain a high degree of control over the precise contents of the program, speeches, the timing, the movements, the dress, and the decorum of students. (Citation omitted).  In this atmosphere the state-imposed character of an invocation and benedictions by clergy selected by the school combine to make the prayer a state-sanctioned religious exercise in which the student has no alternative but to submit." *Id.* at 597, 112 S.Ct. 2660.

Choice of Establishment Clause Analysis

These three tests are divergent and would, applied to this case, provide divergent results. Looking at the particulars of these cases, *Cutter v. Wilkinson*,  ___U.S. ____, 125 S. Ct.2113, 161 L.Ed. 2d 1020 (2005) , and the application of these assorted standards by the lower courts, it is clear that a challenged practice need not pass all of the tests and that the factual circumstances of an individual case will dictate the appropriate legal standard to be applied.

Even *Lemon* itself does not support or require inflexible application of its test or suggest that it is the only appropriate test for Establishment Clause claims. The court in *Lemon* said, "Candor compels acknowledgment ... that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Id.* at 612, 91 S. Ct. 2111.  The *Lemon* court also stresses that the lines to be drawn in each case are very much influenced by the particular facts of the

case. "Judicial caveats against entanglement must recognize that **the line of separation [between church and state], far from being a 'wall' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship."** (Emphasis added). *Id.* at 614, 91 S.Ct. 2112. The particular circumstances of a 'free world' relationship, such as in *Lemon*, and the circumstances in a prison setting are radically different. With this difference in mind, applying *Lemon* to this case appears to be what *Lemon* cautions against : engaging in a "legalistic minuet in which precise rules and form must govern." *Id.*

In *Cutter* the Court upheld the Religious Land Use and Institutionalized Persons Act (RLUIPA) against a challenge that the statute on its face and violated the Establishment Clause. In doing so the majority opinion of the court never performed a *Lemons* analysis. The court frankly acknowledged that RLUIPA was a congressional attempt to provide additional protections for institutionalized persons in religious exercise and to restrict government-imposed burdens. RLUIPA, like its predecessor RFRA were direct reactions to Supreme Court precedent which allowed laws of general application to burden religious freedoms. *Id.* at 2117-8. The court stressed that RLUIPA § 3 was directly applicable to mental hospitals, prisons and similar institutions "in which government exerts a degree of control on unparalleled in civilian society and severely disabling to private religious exercise." *Id.* at 2121. *See also*, *Katcoff v. Marsh*, 755 F.2d 223, 225-229 (2nd Cir 1985)(Army chaplaincy program). RLUIPA's protection for the institutionalized was permissible because the government's level of control leaves those individuals "unable to freely attend to their religious needs and ... therefore dependent on the government's permission and accommodation for the exercise of their religion." *Id.* at 2122. In concurring, Justice Thomas tellingly points out that RLUIPA itself runs afoul of the first two prongs of *Lemon*. *Cutter* did not overrule *Lemon*, but is clear precedent in

support of declining to apply *Lemon* in prison settings.  *See also*, *Van Orden v. Perry*, 125 S Ct. 2854, 162 L.Ed. 2d 607 (2005)(In allowing the display of the Ten Commandments on the grounds of the Texas State Capital, the Court found that the test in *Lemon v. Kurtzman* will not always be useful in making an Establishment Clause analysis and is not the sole means for making the analysis.)

While the Fifth Circuit Court of Appeals has continued to be apply *Lemon* in other fact circumstances, *Freiler v. Tangipahoa Parish Bd. of Educ.,* 185 F.3d 337(5th Cir. 1999),[14] the court has acknowledged *Lemon* is not the only test.  There is no need to review any challenged government action under all three tests and  **depending upon the nature of the challenge,  one or more tests may be appropriately selected, to the exclusion of others**.  *Freiler* at 343-44, *Helms v. Picard*, 151 F.3d 347, 362(5th Cir. 1998).

That prisons present special circumstances where the 'usual' rules of the Establishment Clause appropriately should not be applied has been recognized by multiple courts.  In *Kahane v. United States*, 396 F. Supp. 687(E.D. N.Y. 1975), *affirmed as modified*,  527 F.2d 492 (2nd Cir. 1975), a district court eloquently stated the unique conflict of the two clauses of the First Amendment in a prison setting and the appropriate resolution of the conflict.

> Prisons are located at a unique area of tension between the establishment clause and free exercise clause of the First Amendment. The state, through the establishment clause, cannot require persons to worship in particular ways and cannot aid, endorse, or promote particular religions. (Citations omitted). But **where the government has total control over people's lives, as in prisons, a niche has necessarily been carved into the establishment clause to require the government to afford opportunities for worship**. The free exercise clause embraces both freedom to believe and the freedom to act according to those beliefs. (Citations omitted). The government, in its control of prisons, is precluded from denying religious observance

---

[14]A mandated disclaimer to be read before the teaching of evolution classes in elementary and secondary schools violated the Establishment Clause, running afoul of the second prong of the *Lemon* test.

to inmates. Its obligation to permit religious observance is an extension of the position that no one can be burdened or punished by the state for having the 'wrong' religious beliefs. (Citation omitted). **Thus in the prison setting the establishment clause has been interpreted in light of the affirmative demands of the free exercise clause.**" Id. at 698.(Emphasis added).

The reality is that a strict 'free world' adherence to the Establishment Clause's separation of church and state, applied in a prison setting would leave the other religion clause, Freedom of Expression, a faint ghost of its vigorous 'free world' existence. The undersigned therefore finds that the test found in *Lemon* is an inapplicable and inappropriate test for the action here challenged.

Likewise, in light of *Cutter*, the endorsement test does not seem helpful. Accommodating the various religious needs of the institutionalized may be perceived and to some degree intrinsically involve a societal endorsement of religion generally. The RLUIPA was expressly attacked for favoring religious rights over other types of constitutional rights. It was also suggested that RLUIPA would become a mechanism for obtaining privileges in the name of religion by religious inmates not available to the irreligious. These facial attacks were rebuffed in *Cutter*. The endorsement test therefore does not appear to be appropriate either.

The coercion analysis allows for the needed accommodation in prison settings of religious belief and practice, while protecting against forced inculcation into any religious belief. Coupled with the Equal Protection Clause, it can guarantee the needed governmental neutrality between the various faiths. Coronel's claim is therefore analyzed using this coercion test.

3. Application of coercion test to Coronel's claims

Under the coercion analysis, religiously based programs are constitutionally permissible, provided that secular alternatives are available, and provided individuals are free to choose either the faith based or secular alternatives. Where the individual is free to choose, there is not a link between

government and religion to implicate the Establishment Clause. *Zelman v Simmons- Harris*, 536 U.S. 639, 122 S Ct. 2460, 153 L.Ed 2d 604(2002)(Utilizing a coercion analysis to uphold school voucher programs).[15]

In the present case there is no question that CCA offers both a faith based and a secular life skills program. There is no showing of any disparity of resources or effectiveness in these programs, but there is no requirement that the programs be identical. In *Freedom from Religion v McCallum*, 324 F. 3d 880(7th Cir. 2003) the state department of corrections had contracts with both secular halfway houses and with Faithworks, a Christian halfway house. While like LCPC, there was no requirement that an individual be a Christian in order to participate, in practice the state's parole officers would not recommend any offender who had no Christian identity and religious interest and would not advise anyone to convert. Like the situation at TCCF, the faith based programs and the secular programs were not identical. The Faith Works program offered a nine month residential program, while the secular programs lasted a maximum of three months. The longer program was considered superior in effectiveness in dealing with drug and alcohol addictions. There because the choice between programs was the inmate's, not the state's, there was no violation of the Establishment Clause. Coronel does not suggest that he was coerced into joining the program. He does not suggest that he was coerced into staying in the program, to the contrary having complained that he was coerced out

---

[15] As noted earlier, the way the parties describe the LPCP program differs. The defendants describe a rehabilitation program with admitted Christian components. Coronel, while providing documents in the record that show it to be a life skills program, describes the program hours as if they resembled a church meeting. Whether the program is sprinkled with religious elements or immersed in them is not material to the Establishment Clause analysis. Both the Free Exercise and Establishment Clauses prohibit judicial inquiry into the theology of the faith based program or the pervasiveness of religious versus secular elements in the program.

of it. The required freedom of choice is apparent and uncontested in this case. Nor was there any parole or classification benefit associated with the program, nor parole or classification penalty attached to departing from the program.

A review of other cases, both factually similar and dissimilar, demonstrate the lack of merit to Coronel's attempt to claim he was coerced. In *Kerr v. Farrey*, 324 F. 3d 880(7th Cir. 2003) the Seventh Circuit Court of Appeals held that requiring an inmate to attend Narcotic's Anonymous meetings, with its spiritual content, on pain of being rated a higher security risk and potentially suffering adverse parole action was a violation of the Establishment Clause. In, *In re Garcia*, 106 Wash. App. 625, 24 P. 3d 1091(Wash.Ct.App. 2001) a state court relying on *Kerr,* found no violation of the Establishment Clause where an inmate lost good conduct time credits as a sanction for his failure to attend chemical dependency treatment classes. While the inmate was initially enrolled in AA or NA, both of which had religious/spiritual content, there was no violation of the Establishment Clause because secular alternatives were provided.) *See, Bobko v Lavan*, 2005 WL 1309072(M.D. Pa. May 31, 2005)(The prisoner refused to participate in a religious drug and alcohol program. He also refused to participate in the secular alternative. He was denied parole for his failure to participate in drug and alcohol counseling. "[A] prisoner is not unconstitutionally coerced to participate in religion if he may meet a rehabilitation requirement in an alternative secular program.") Unlike the inmate in *Kerr*, Coronel was never compelled to enter the program. The only distinction between Coronel's case and *Garcia* and *Bobko* is that Coronel was freer because he did not have to attend either version of the program.

As discussed above, CCA has offered a secular alternative program to this life skills program. As also discussed above, Coronel was offered a choice. He could participate in the program if he

wished.  He could participate in the secular program if he wished. He could participate in neither of the programs if he wished.  That the faith based program he desired was not available does not offend the Establishment Clause.  "It is a misunderstanding of freedom...to suppose that choice is not free when the objects between which the chooser must choose are not equally attractive to him," *Freedom from Religion* at 884, or that  every conceivable choice is not available to the chooser.

The niche carved into the Establishment Clause to allow prisoners their Free Exercise rights is occupied by the Wiccans.  They practice their faith twice a week with the coordination and assistance of a CCA paid chaplain,  in CCA provided facilities with necessary CCA provided security. The Wiccans enjoy CCA provided feast meals and CCA provided hospitality treats.  That same niche likewise provides shelter to this Christian rehabilitation program.  This claim is without merit.

## EQUAL PROTECTION AND DUE PROCESS OF LAW

Coronel claims the existence of the LPCP violates his rights under the Equal Protection Clause. The burden of proof for each element of this claim is upon Coronel.  In order to avoid summary judgment on this issue, he must set forth admissible evidence to support these elements.  It is not sufficient to prove that one group of inmates is treated differently that another.  Coronel must show, 1)  that similarly situated groups, 2) are treated differently and 3) that the difference is the result of purposeful discrimination.  *Mohammed v. Lynaugh*, 966 F.2d 901, 903 ( 5th Cir. 1992)("To succeed on his equal protection claim, Adkins "must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated.")( citing *McCleskey v. Kemp*, 481 US 279, 107 S Ct. 1756, 95 L.Ed. 2d 262 (1987)).

The fact that the Equal Protection claim relates to religious rights does not change the standard. Case law establishes that the Equal Protection clause and "The Fourteenth Amendment does not

demand 'that every religious sect or group within the prison, however few in numbers, must have identical facilities or personnel.'" *Freeman v. Texas Department of Criminal Justice*, 369 F.3d 854, 862 - 63 (quoting *Cruz v. Beto*, 405US. 319, 312 n.2, 92 S Ct. 1079, 31 L.Ed. 2d 263 (1972)). "A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty." *Cruz v Beto*, 405 U.S. at 322, 92 S.Ct. at 1082, N. 2. Under the rationale of the *Cruz* case no special faith based program would need to be provided for each faith without regard to the availability or demand for the program.

Here Christian inmates and non-Christians not offended by the Christian elements of the program are offered a faith based life skill program. Coronel claims that he is one of four Wiccans within the unit. He claims about twenty-five percent of the participants are not Christians. The other proof in the record is that the Wiccans are one of nine or ten different groups. The 58 weekly religious services CCA are attended by some 600 inmates per week. Coronel has the burden of proving that he is part of a 'similarly situated' group. The proof he offers will not support a jury verdict on that element in his favor.

The record also provides undisputed proof that reasonable opportunities to practice his faith have been provided to Coronel. An additional impediment to Coronel's claims is the fact that his claim includes a demand to be housed in a particular unit. Coronel has no right to demand any particular housing. *See Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

This claim should be dismissed and judgment granted the defendants on this claim.

## CLAIM FOR COMPENSATORY DAMAGES

Alternatively, and in addition to the above recommendation, the undersigned recommends that the plaintiff's claim for compensatory damages be dismissed pursuant to 42 U.S.C.§ 1997e(e) and *Alexander v. Tippah County, Mississippi*, 351 F. 3d 626(5th Cir. 2003).

Under 42 U.S.C.A. § 1997e(e) "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury." See *Geiger v. Jowers*, 404 F.3d 371(5th Cir. 2005)(The requirement of a physical injury as a prerequisite to a claim for compensatory damages is not dependent upon the nature of the underlying constitutional claim; affirming the dismissal of a claim for First Amendment violations)**;** *Brown v. Hembest*, 2005 WL 1174661(N.D. Miss. 2005)(Pro se complaint alleging failure to prevent  inmate on inmate violence dismissed partly due to failure to allege any physical injury); *Brown v. Sudduth*, 2005 WL 2406090(N.D. Miss. 2005) ("As ... Brown seeks only money damages, and as he has not alleged physical injury, his claims for compensatory damages must fail." *Id.* at 4.); *Jones v. Greninger,* 188 F. 3d 322(5th Cir. 1999)(Eighth Amendment claim for damages for failure to protect properly dismissed for failure to allege physical injury).  Here Coronel briefly mentions unspecified physical illnesses in his complaint.  In response to the motion for summary judgment, Coronel claims gastrointestinal surgery in April 21, 2006 as his physical injury.  He underwent a colonoscopy and claims he suffered urinary tract complications after the surgery which extended his hospitalization and required additional treatment.  He claims that it is his understanding that the defendants' conduct contributed to his medical condition.  He also attaches a report showing that he was found to have internal hemorrhoids and small sigmoid diverticulosis.  Coronel's 'understanding' is not admissible.  He designated no expert witness to connect his physical injury to

the defendants' conduct.  Any connection is certainly not obvious and could only be established by expert testimony. He has failed to offer any admissible proof of a physical injury to justify the imposition of compensatory damages. The claim for compensatory damages should be denied.

## INJUNCTIVE AND DECLARATORY RELIEF

Coronel has sought injunctive to compel the faith based unit to operate as a multi-faith unit, to avoid being 'forced' to study Christian materials and declaratory relief that his rights have been violated.

The defendants assert that the claim for injunctive relief is now moot due to Coronel's expulsion from the unit.  Generally a transfer of an inmate from one prison will render a claim for injunctive relief moot.  *Beck v. Lynaugh*, 842 F. 2d 759, 762(5th Cir. 1987); *Cooper v. Sheriff, Lubbock County,* 929 F. 2d 1078(5th Cir. 1991).  Coronel, however, remains at TCCF.  The removal from one area of the prison and its program is not necessarily the equivalent of a transfer from one prison to another.  The defendants cite a case in support of their position from outside this circuit.  In the absence of binding authority to support the defendants' position, the undersigned does not believe that all of Coronel's claims for injunctive relief are necessarily moot.

His removal from the faith based pod would appear to have mooted any Free Expression or RLUIPA claim for injunctive or declaratory relief.  Whatever 'coercion' may have ever been applied to Coronel in his religious practices while in the unit, he is no longer subject to any coercion and there is nothing in the record to indicate that the defendants would allow, much less force Coronel to re-enter this program.  This claim should be dismissed as moot.

While the undersigned recommends the dismissal of the Equal Protection/Due Process Clause claim and Establishment Clause claim on summary judgment, the undersigned does not agree those

claims would be mooted by Coronel's removal from the program. If the court finds that there are triable issues of fact on these claims, it appears that some type of declaratory and/or injunctive relief might be appropriate.

. **PUNITIVE DAMAGES**

To allow punitive damages, a defendant's conduct must be motivated by "evil intent" or demonstrate subjective "reckless or callous indifference" amounting to "criminal indifference to civil obligations." *Williams v. Kaufman County,* 352 F. 3d 994, 1015(Citing *Sockwell v. Phelps*, 20 F.3d 187, 192(5th Cir. 1994); *Smith v. Wade*, 461 U.S. 30, 37 n. 6, 41, 56, 103 S. Ct. 1625, 75 L Ed. 2d 632(1983) and *Kolstad v. Am.Dental Ass'n*. 527 U.S. 526, 536, 119 S. Ct. 2118, 144 L. Ed.2d 494 (1999). The closest Coronel comes to setting forth any proof on to support a claim for punitive damages is showing the existence of acrimony and animosity between himself and Walker. Coronel complains bitterly of Walker's condemnation of witchcraft. Within the context of teaching the classes, Walker's speech is protected by the First Amendment, regardless of how offensive it may be to Coronel.[16] Walker stands accused of making various threats, not carried out, of disciplinary action, and of otherwise by his words and tone of voice exhibiting his hostility toward Coronel and other non-Christians in the unit. If Walker's words however threatening and antagonistic cannot support an underlying claim for liability, *a fortiorari*, they are insufficient to support a claim for punitive damages. *See McFadden, supra.,* The claim for punitive damages should be dismissed with prejudice.

---

[16] "The chaplain Defendants argue that they were not state actors when addressing theological questions, and thus, they are not liable under the constitutional and statutory authority relied on by Plaintiffs. The Court agrees that the Defendants cannot be liable for actions undertaken in their purely ecclesiastical capacity such as interpreting and implementing religious doctrine during religious services or classes." *Orafan v. Goord*, 411 F. Supp 2d 153 (D.C. N.D. N.Y. 2006).

The undersigned recommends that the plaintiff's complaint be dismissed in its entirety with prejudice pursuant to 42 U.S.C. § 1997e(e).

The parties are referred to 28 U.S.C. 636(b)(1) and Local Rule 72.2(D) for the appropriate procedure in the event any party desires to file objections to these findings and recommendations. Objections are required to be in writing and must be filed within ten days of this date. Failure to file written objections to the proposed finding and recommendations contained in this report within ten days from the date of filing will bar an aggrieved party from challenging on appeal both the proposed factual findings and the proposed legal conclusions accepted by the district court *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Petitioner is directed to acknowledge receipt of this report and recommendation by signing the enclosed acknowledgment form and returning it to the court within ten days of this date. Petitioner is warned that failure to comply with the requirements of this paragraph may lead to the dismissal of this lawsuit under F.R.Civ.P. 41(b) for failure to prosecute and for failure to comply with an order of the court.

This the 14th day of September, 2006.


/s/ JERRY A. DAVIS
UNITED STATES MAGISTRATE JUDGE